UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DR. SAMMIE E. HARRIS,

                Plaintiff,                  CIVIL ACTION NO. 04-CV-40153-FL

        v.                        DISTRICT JUDGE PAUL V. GADOLA

DETROIT PUBLIC SCHOOLS,        MAGISTRATE JUDGE MONA K. MAJZOUB
ET AL.,

                Defendant.
_____/

## REPORT AND RECOMMENDATION

This Court recommends that Defendants' Motion for Summary Judgment be **GRANTED**.

Plaintiff filed the instant employment action on May 27, 2004 alleging four causes of action under 42 U.S.C. 1983 as well as a variety of state law claims. Plaintiff is a former employee of Defendant Detroit Public Schools ("DPS"). He served as a principal at Northern High School from August 2000 until June 30, 2004.

The individual Defendants were employed by DPS at the time of Plaintiff's termination: Kenneth S. Burnley, Ph.D., DPS's Chief Executive Officer; Juanita Clay Chambers, Ph.D., DPS Chief Academic Officer; David Porter, Ph.D., Executive Director of the "Northern Constellation" of DPS schools; Debra F. Williams, DPS Chief Human Resources Officer; April Royster, DPS "Chief of Internal Audit"; and Richard H. Davis, a teacher at Northern High School who maintained the high school's accounting books prior to July 2003.

Defendants filed the instant Motion for Summary Judgment on June 20, 2005. The motion was referred to the undersigned for determination on August 29, 2005. The parties have fully briefed the

1

motion, and this Court, having concluded that oral argument would not be of assistance in reaching a determination, entered an order for determination without oral hearing on September 26, 2005.

## FACTS

Plaintiff began working as a principal at DPS's Northern High School in August, 2000. During his employment, Plaintiff signed a series of one year employment contracts with DPS. The last signed contract explicitly covers the period from July 1, 2003 to June 30, 2004. (Defs.' Mot. for S.J. at Ex. 2).

On December 30, 2003 Defendant Porter directed Plaintiff to report to the Office of the Chief of Staff for a 9:00 a.m. meeting. (Defs.' Mot. for S.J. at Ex. 10). Plaintiff was informed that Defendant Davis had suggested to the DPS Audit Division that fundraising activities at Northern High School conducted by the "Sign-A-Rama" had not been properly approved or administered. *Id.* On January 21, 2004 Plaintiff sent a memorandum to Debra Williams concerning his retirement.

> Be advised that I will retire at the end of June 2004. As a result of minimum sight in my right eye, it has become very difficult for me to keep up with reading the numerous daily correspondence, reports, and emails.
>
> It was my intent to work for an additional five years, however, I realized that I would not be able to give the students one-hundred percent in terms of leadership.
>
> Would you please advise as to what I need to do or what to submit to Human Resources to bring about closure. Also would you submit in writing how many hours I will be compensated for in terms of the 195 days of sick time accumulated.
>
> I thank you for your assistance. It is greatly appreciated.

[sic] (Defs.' Mot. for S.J. at Ex. 6).

Plaintiff spoke with DPS Interim Director of Benefits and Compensation Perrie Johnson on January 26, 2004. (Defs.' Mot. for S.J. at Ex. 7). On January 27, 2004 Johnson sent Plaintiff a letter

indicating that he would have 35 days of accrued sick time upon his planned retirement and further advising that, once the DPS Office of Retirement Services had confirmed his eligibility for retirement, Plaintiff could effectively terminate his services by completing and submitting a form designated as "Form 4149." *Id.*

Also on January 27, 2004 DPS released the results of internal financial audits of a number of Detroit high schools. Among the audits released that day was an audit designated as the "Northern High School Financial Audit Follow-Up Report No.: 02-30." ("the 2004 audit") (Defs.' Mot. for S.J. at Ex. 1 p. 1). Prior audits of Northern High School had revealed substantial financial irregularities. The 2004 audit covered Northern High School's finances from the period beginning July 1 1998 and ending June 30, 2002. *Id.* It identified Plaintiff as having been the Principal at Northern High School since September 2000. *Id.*

The 2004 audit revealed several unresolved problems with Northern High School's finances. It identified $2579.16 inappropriately paid out of the school's "general fund" between October 1998 and April 2000. *Id.* at p. 4. Bank Reconciliations and Trial Balances were not prepared monthly for Northern High School as required by DPS regulations. *Id.* As a result, there was no record of differences between Northern High School's monthly school cash and bank cash balances, and no financial report detailing monthly cash and account balances and activities. *Id.* The 2004 audit revealed that Northern High School had $19,090.47 more in cash receipts available for deposit than it had deposited in ther period from July 1998 through June 2001, and $644.92 more in cash receipts available for deposited than actually deposited in the period from July 2001 through June 2002. *Id.* at p. 6. The 2004 audit also revealed $2,629.05 in funds that were unavailable for Northern High School's operations because they were inappropriately deposited into the DPS Revenue Depository account rather than Northern High School's checking account in 2001 and 2002. *Id.*

In addition, the 2004 audit showed that Northern High School had not maintained Fundraiser Approvals and Profit and Loss statements, and thus there was no documentation to show that school fundraising activities were approved by DPS or that specific fundraising activities were of financial benefit to the student body. *Id.* at p. 5. Attached to the 2004 audit was a statement entitled "Management Response," prepared by Plaintiff and dated November 10, 2003. *Id.* at p. 8.

On January 28, 2004 an investigator from the DPS office of the General Counsel went to Northern High School and unsuccessfully attempted to confiscate computers from the Sign-A-Rama office. (Defs.' Mot. For S.J. at Ex. 11). On January 29, 2004 employees from the DPS Office of Internal Audit appeared at Northern High School and successfully confiscated two computers located in the Sign-A-Rama office. (Defs.' Mot. For S. J. At Ex. 10).

On February 2, 2004 Plaintiff submitted his Form 4149, indicating that he would retire on June 30, 2004. (Defs.' Mot. for S.J. at Ex. 8).

On February 3, 2004 the Detroit Free Press and several other local papers ran stories concerning the 2004 audit and other DPS audits released on the same day. (Defs.' Mot. for S.J. at Ex. 9). The stories did not identify Plaintiff by name, but did name Northern High School and listed some financial details of the 2004 audit. *Id.* Plaintiff wrote a letter to Defendant Burnley regarding the news coverage on February 4, 2004. He stated, in part:

> . . . I surmise in terms of what has taken place at Northern over the past six months that there has been an orchestrated effort designed to discredit my efforts to educate the students. It appears that nebulous mixtures of idioms have been used by members of your administration regarding me in order to confuse the concerns involving Northern High School.
>
> In furtherance of the above, I wish to address additional problems. In all candor, I have languished for several months prior to submitting this letter; however, at this juncture I am beyond anger as a result of the unprofessional behavior and lack of support by members of your staff.

4

As a result of the information released to the news media my credibility, character, integrity and honor are being questioned.

My employment opportunities after leaving the district have been diminished as a result of the alleged information involving Northern which everyone in your administration knows occurred before I arrived.

I informed April Royster, Chief of Internal Audit, in a letter dated November 10, 2003 that the $19,090.47 irreconcilable funds took place prior to my arrival in August of 2000. I further informed her that funds spent on a refrigerator, staff luncheons, flowers and gifts took place prior to my arrival. She has this information on file; so why wasn't it included in the news release? . . .

[sic] (Defs. Mot. For S.J. at Ex. 10)

On February 6, 2004 Defendant Sturgis wrote Plaintiff a letter indicating that he was being placed on paid administrative leave pending the final results of an investigation into Northern High School's finances. (Ex. 13). Plaintiff continued to receive his full salary through June 30, 2004.

On April 19, 2004 Plaintiff wrote a letter to Defendant Williams expressing his desire to rescind his retirement notice and continue his employment with DPS. (Ex. 14). On April 26, 2004 Defendant Williams sent Plaintiff a letter informing him that he would not be permitted to rescind his request to retire. (Ex. 15).

## STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Covington v. Knox County Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). Once the moving party has met its burden of production, the non-moving party must come forward with significant probative evidence showing that a genuine issue exists for trial. *Id.* A mere scintilla of evidence is insufficient to

defeat a supported motion for summary judgment; rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). While the evidence itself need not be the sort admissible at trial, the evidence must be more than the non-movant's own pleadings and affidavits. *Ashbook v. Block*, 917 F.2d 918, 921 (6th Cir. 1990); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (explaining that the non-moving party may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact).

## ANALYSIS

Plaintiff's Complaint contains four causes of action under 42 U.S.C. § 1983, as well as several state law claims. Plaintiff alleges in Count II that Defendants retaliated against him for exercising his First Amendment right to free speech. Plaintiff alleges in Count III that Defendants denied him Procedural Due Process by placing him on administrative leave at around the same time that the media began reporting the results of the 2004 audit. Plaintiff alleges in Count IV that he was deprived of a property interest protected by Substantive Due Process as a tenured teacher when DPS declined to renew his contract as a principal. Plaintiff Alleges in Count VI that DPS infringed on his constitutionally protected liberty interest in his reputation by releasing the results of the 2004 audit.

## I.     First Amendment Retaliation

> [A] public employee who claims that an employment decision was made in retaliation for engaging in protected speech . . . must show that: (1) the plaintiff was engaged in constitutionally protected speech; (2) the plaintiff was subjected to an adverse action or deprived of some benefit; and (3) the protected speech was a substantial or a motivating factor in the adverse action.

*Banks v. Wolfe County Bd. of Ed.*, 330 F. 3d 888, 892 (6th Cir. 2003).

The Constitution protects speech by public employees that (1) touches upon matters of public concern whenever (2) a plaintiff's "interest in making such statements outweighs the interest of the

State, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering v. Board of Educ. Of Towhship High School Dist. 205*, 391 U.S. 563, 568 (1968).

Plaintiff alleges that he was a vocal critic of DPS staffing and disciplinary policies. DPS policies that potentially affect the quality of public education are matters of public concern. The Court also assumes that DPS's decisions to place Plaintiff on administrative leave and not to rescind his retirement were adverse employment actions. However, Plaintiff's First Amendment claim must fail because he has done nothing to show that his protected speech was a factor in Defendants' adverse actions.

Defendants have come forward with evidence suggesting that Plaintiff was placed on administrative leave because of irregularities in fundraising activity at Northern High School. (Defs. Mot. For S.J. Ex. 4 (Deposition of April Royster) at p. 11, Ex. 11 and Ex. 13). Defendants have also produced evidence tending to show that DPS was not granting any requests for recission of retirement in April 2004, due to a severe budget crisis. *Id.* at Ex. 5 (Deposition of Debra Williams) p. 5). Plaintiff, on the other hand, has failed to come forward with any evidence suggesting that Defendants' actions were related to his First Amendment activity. Given the state of the evidence, no reasonable trier of fact could conclude that Defendants were motivated by a desire to retaliate against Plaintiff because of his speech on matters of public concern.

## II.     Procedural Due Process

The Fourteenth Amendment forbids state actors from depriving "any person of life, liberty or property without due process of law." U.S. Const. Amend. XIV. To establish a violation of procedural due process, a plaintiff must prove (1) that he was deprived of a property interest and (2) that the procedures afforded to protect that interest were insufficient. *Barrett v. Steubenville City Sch.,* 388 F.3d 967, 971 (6th Cir. 2004).

Plaintiff claims that Defendants violated his Due Process rights "in that he was removed from his position as principal concurrent with DPS' dissemination in the media of stigmatizing or defamatory material touching upon Plaintiff." (Pl.'s Compl. Count III). It is not clear what Plaintiff means by this. The Due Process Clause gives Plaintiff certain procedural protections before Defendants may deprive him of life, liberty, or property. It does not contain any guarantee that Defendants cannot, after following adequate procedures, visit multiple deprivations upon Plaintiff at around the same time.

The Court assumes that Plaintiff's Count III alleges two separate wrongs that are more closely connected with procedural due process: that Defendants failed to provide Plaintiff with adequate procedural protections before harming his reputation by releasing the 2004 audit to the media, and that Defendants failed to provide Plaintiff with adequate procedural protections before they deprived Plaintiff of property interest in his job by placing him administrative leave with pay and denying his request to rescind his retirement.

A.      **Plaintiff's Reputation**

A person's interests in his reputation, good name, honor, and integrity are protected by the Due Process Clause. Quinn v. Shirey, 293 F.3d 315, 319 (6th Cir. 2002). However, mere damage to reputation does not implicate Due Process. Rather, the damage to reputation must by accompanied by a deprivation of a tangible interest or "some alteration of a right or status 'previously recognized by state law.'" Id. (internal citations omitted). Procedural Due Process provides a plaintiff with the right to have an opportunity to clear his name when a defendant voluntarily disseminates false information about the plaintiff in the courts of the defendant's decision to terminate the plaintiff's public employment. Id. at 319-320.

However, a plaintiff can only establish a violation of procedural due process with respect to his interest in his reputation if (1) he actually requested a name clearing hearing and (2) the defendant

8

denied plaintiff's request. *Id.* A name-clearing hearing is a hearing that affords the aggrieved employee "an opportunity to be heard" and "refute the charges against him." *Id.* The hearing need not be formal. *Id.*

Here, Plaintiff appears to have taken advantage of an early opportunity to protect his reputation with respect to the 2004 audit. Defendants apparently allowed Plaintiff to review the findings of the 2004 audit sometime in 2003. Plaintiff wrote a letter in response dated November 10, 2003. Plaintiff's response was included in the 2004 audit report released to the media. While Plaintiff appears to have become quite angry after the release of the 2004 audit to the media, there is nothing in the record suggesting that he actually requested any other opportunity to clear his name.

Regardless of whether Plaintiff's opportunity to respond in advance to the potentially damaging information in the 2004 audit is sufficient to satisfy due process, Plaintiff's procedural due process claim fails because he has not demonstrated that Defendants denied a request by Plaintiff for an opportunity to clear his name.

**B.      Plaintiff's Employment**

**1.      Plaintiff's Position as a Principal**

Plaintiff claims that he had a property interest in his continued employment as a principal with the Detroit Public Schools. Property interests are not created by the Constitution, rather, they are "'created and defined by existing rules or understandings that stem from an independent source such as state law.'" *Sutton v. Cleveland Bd. Of Education,* 958 F.2d 1339, 1348 (6th Cir. 1992). Michigan law recognizes the creation of a property right in government employment by statute, by written contract, and when an employer's conduct creates a reasonable expectation in an employee that a position is permanent. *Bracco v. Michigan Tech. Univ.*, 588 N.W.2d 467, 472 (Mich. App. 1998). A public employee has no "property interest in continued employment when his position is held at the will and pleasure

of his superiors and when he has not been promised that he will only be terminated for cause."
*Chilingarian v. Boris*, 882 F.2d 200, 203 (6th Cir. 1989).

Plaintiff's principal position is not covered by a collective bargaining agreement. In Michigan "each employee of the . . . school district whose position is not covered by a collective bargaining agreement is employed at the will of the chief executive officer." Mich. Comp. Laws Ann. §380.373(6). Plaintiff's employment contract supports the notion that Plaintiff's position was at will:

Section III

At Will Employment

The School Principal . . . serves at the pleasure of the CEO. The CEO may terminate this Agreement, at his/her sole discretion with or without cause, only subject to the terms of this agreement. No modification of this provision shall be binding unless expressed in writing and signed by the CEO.

Section IV

Effects of Termination

4.1 Termination without cause, under Section 3 of this Agreement, shall not affect the right of the Employee to receive compensation for the unexpired term of this agreement, to be paid according to the terms at the times set forth in this agreement.

(Defs.' Mot. for Summ. J. at Ex. 2)

If terminated without cause, Plaintiff retained the right to be paid full salary until the end of his contract term in June, 2004. DPS paid Plaintiff's full salary through this date. Plaintiff does not have any additional property interest in his position as a DPS principal. Plaintiff therefore has no procedural due process claim.

10

2.      **Plaintiff's Position as a Tenured Teacher**

Plaintiff alleges, and Defendants do not protest, that he has a property interest in his tenured position as a teacher with DPS. The Court assumes, arguendo, that Plaintiff had such a property interest, and that Defendants deprived him of it. However, a § 1983 Plaintiff alleging deprivation of a property interest without procedural due process " must plead and prove that state remedies for redressing the wrong are inadequate." *Vicory v. Walton*, 721 F.2d 1062, 1065-1066 (6th Cir. 1984). Public employees cannot establish constitutional deprivations of their due process right if "satisfactory state procedures are provided." *Jefferson v. Jefferson County Public Sch. Sys.*, 360 F.3d 583, 585 (6th Cir. 2004) (internal citations omitted). Plaintiff has failed to allege that the procedures set forth in Michigan's Teacher Tenure Act were inadequate. Furthermore, the Court is unaware of any reason to find that Michigan's Teacher Tenure Act provided inadequate Plaintiff opportunity to address Defendants' alleged wrongs.

III.    **Substantive Due Process**

In addition to providing procedural protection to interests in life, liberty, and property, the Fourteenth Amendment's Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The Court has granted substantive rather than procedural protection to those "fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition . . . implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 720-721 (internal citations and quotations omitted).

Plaintiff has provided no support for the proposition that his name, his reputation, or his employment with DPS somehow fall within the exceedingly narrow aegis of substantive due process. Indeed, the Supreme Court found in *Paul v. Davis*, 424 U.S. 693, 713-714 that there is no fundamental

11

liberty interest infringed by the dissemination of defamatory non-private information about Plaintiff. The Sixth Circuit has held that termination of public employment does not constitute a denial of substantive due process.  *Sutton*, 958 F.2d at 1351.  Plaintiff's substantive due process claims must therefore fail.

## IV.   State Law Claims

Although Defendants' Motion for Summary Judgment seeks summary judgment as to Plaintiff's entire case, it does not address Plaintiff's several state law claims.  Plaintiff's opposition to Defendants' Motion contains no more than passing reference to the state law issues in this case.  Accordingly, Defendant's Motion for Summary Judgment should be **DENIED** with respect to the state law claims.

The undersigned recommends that the Court should now decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining claims.  When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172-73 (1997).  In exercising its discretion, the Court must look to considerations of judicial economy, convenience, fairness, and comity, and also avoid needless decisions of state law. *See Id.* at 173.

The parties are not diverse and there is no federal issue remaining, since Defendant is entitled to Summary Judgment on all of Plaintiff's federal claims.  The exercise of supplemental jurisdiction would require this Court to engage in the analysis of purely state law issues.  The state courts are the preferred forum for diputes between non-diverse parties dealing only with issues of state law. *See Id.* The Court therefore recommends that Plaintiff's state law claims be **DISMISSED** without prejudice.


Dated: February 14, 2006                    s/ Mona K. Majzoub
                                            MONA K. MAJZOUB
                                            UNITED STATES MAGISTRATE JUDGE

**<u>Proof of Service</u>**

      I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: February 14, 2006            <u>s/ Lisa C. Bartlett                    </u>
                                           Courtroom Deputy

13